**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MICHELLE DELEO,

        Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

> Civil Action No. 14-5503 (JLL)
>
> **OPINION**

**LINARES**, District Judge.

    Before the Court is Plaintiff Michelle Deleo ("Plaintiff")'s appeal of Administrative Law Judge ("ALJ") Richard West's decision denying Plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). The Court has considered the submissions made in support of and in opposition to the instant appeal and decides this matter without oral argument. Fed. R. Civ. P. 78. For the reasons set forth below, the Court remands this matter for further proceedings consistent with this Opinion.

## I.    BACKGROUND

### A.    Plaintiff's Mental and Physical Impairments

1. Physical Impairments

    Plaintiff maintains that she was disabled from October 5, 2007 through September 5, 2012, the date the ALJ issued his adverse decision. (*See* ECF No. 1). Plaintiff's impairments are set forth below, chronologically, based upon the medical evidence contained in the record.

On September 28, 2007, Plaintiff gave birth to her daughter via C-section at Hackensack University Medical Center (HUMC). (R. at 365-66). On October 5, 2007, Plaintiff was admitted to HUMC and treated by Dr. Douglas Benson for MSRA and necrotizing fasciitis. (*Id.* at 375-422). Plaintiff had her wound debrided on October 5, 2007, and was brought into the operating room again on October 6, 2007 for a "washout." (*Id.*). Plantiff's wound was dressed with a vacuum assisted closure, or VAC, and she was subsequently put on the medication Vancomycin. (*Id.*). Plaintiff was discharged on October 19, 2007, with instructions to see Dr. Benson in one week and to follow up with Dr. Saber in the clinic in two weeks. (*Id.* at 375).

On October 24, 2007, Plaintiff returned to HUMC to receive wound care and was discharged the same day. (*Id.* at 428-33). On December 11, 2007, Plaintiff was seen by a physician at HUMC, who indicated in a treatment note that Plaintiff's wound was healed and closed, with no signs of a hernia. (*Id.* at 451). Another treatment note, dated January 15, 2008, indicated that Plaintiff had muscle weakness (hernia) in the area of debridement, but also indicated that Plaintiff should be able to resume activity and would possibly require plastic reconstruction in one year. (*Id.*). On February 26, 2008, during a routine visit to the clinic at HUMC, Plaintiff complained of psoriasis and was referred to a dermatologist. (*Id.* at 505). The treatment note from the February 26, 2008 visit also reveals that Plaintiff was told to follow up with a surgeon, Dr. Benson, for a hernia repair in May of 2008. (*Id.* at 506). The treatment note also indicated that Plaintiff should use a truss to support her hernia, and that she had a 90-day "disability" due to her hernia. (*Id.*).

On February 26, 2008, a form was completed by Dr. Nora Tossounia, certifying that Plaintiff was unable to engage in the WFNJ work requirement due to her primary diagnosis of necrotizing fasciitis as the site of the C-section and her alternative diagnosis of depression. (*Id.* at 487). Dr. Tossounia indicated that Plaintiff was not receiving treatment at the time she made her

2

report. (*Id.*). Dr. Tossounia also indicated that Plaintiff should only perform sedentary work, and that she should lift no more than 20 pounds, and stand for no longer than 5 minutes at a time. (*Id.*). Although Dr. Tossounia's report is dated February 26, 2008, it was not submitted into evidence until January 9, 2012, just days before her hearing before ALJ West. (*Id.*).

On May 27, 2008, Plaintiff returned to the clinic, indicating that her psoriasis has not improved or responded to the medication prescribed at her last visit. (*Id.* at 502). Plaintiff was referred to a dermatologist as well as a surgeon regarding her hernia. (*Id.* at 503). On September 19, 2008, Plaintiff was seen by William K. Boss, Jr., who examined Plaintiff's hernia and recommended abdominal wall reconstruction including a resection and dermal grafting. (*Id.* at 436). On December 3, 2008, Plaintiff returned to Dr. Boss for a second consultation. (*Id.* at 437). In his treatment notes, Dr. Boss indicated that Plaintiff did not stop smoking although she had promised to do so. (*Id.*). Dr. Boss noted that he explained the additional risks of smoking before a surgery to the Plaintiff, but ultimately decided to proceed with the surgery with a different approach, attempting to avoid possible infection due to Plaintiff's smoking. (*Id.*). On December 4, 2008, Dr. Boss and Dr. Benson performed Plaintiff's hernia repair. (*Id.* at 438-39). Outpatient visits on December 16, 2008 and December 22, 2008 revealed that Plaintiff's wound healed well, and that no sign or symptoms of infection were present. (*Id.* at 441). On January 20, 2009, Plaintiff was seen by Dr. Benson, who indicated that although Plaintiff complained of lower left quadrant pain, there was no sign of a hernia and her incision site looked good. (*Id.* at 449). On April 28, 2009, Plaintiff was seen by Dr. Benson, who indicated that Plaintiffs wound was well healed. (*Id.* at 449). At the April 28, 2009 visit, Plaintiff again complained of lower left quadrant pain when lifting her daughter; Dr. Benson subsequently advised Plaintiff to seek pain management and restrict lifting. (*Id.*).

3

On June 17, 2009, Dr. Joseph Damico reviewed the medical evidence and indicated the Plaintiff's incision was healing well following her hernia surgery on December 4, 2008. (*Id.* at 462). He also indicated the Plaintiff had an RFC for light work. (*Id.*).

On May 5, 2010, Plaintiff sought treatment from Dr. Amir Hanna for neck and lower back pain. (*Id.* at 529). Dr. Hanna's treatment notes indicated Plaintiff had limited neck rotation and was also limited in bending forward. (*Id.* at 530). Dr. Hanna referred Plaintiff for an MRI of the cervical and lumbosacral spine, as well an EMG, nerve conduction studies and a CT scan of her abdomen. (*Id.*). He also referred Plaintiff to the gynecology department to rule out pelvic adhesions and to the surgery department to rule out abdominal adhesions. (*Id.*). The EMG study indicated no evidence of lumbar or cervical radiculopathy, but was consistent with peripheral neuropathy of the lower extremities. (*Id.* at 533). On May 28, 2012 Plaintiff underwent a CT scan which revealed an anteverted uterus containing a tiny and unremarkable cystic focus on the right, and an adnexal cyst on the left, with a questionable right-sided uterine fibroid on the right. (*Id.* at 509). A pelvic ultrasound was subsequently recommended. (*Id.*).

On June 13, 2009, Dr. Jose Rabelo, a consulting internist for the state agency, reviewed the evidence provided by the Plaintiff, and recommended a Residual Functional Capacity (RFC) for light work, with restrictions including only occasional climbing of ramps and stairs, and kneeling do to Plaintiff's abdominal hernia. (*Id.* at 457,460).

On February 12, 2010, Dr. Agop Artihlan completed a form asserting that Plaintiff was unable to engage in the WFNJ work requirement from February 12, 2010 through August 12, 2010 because of illnesses including fibromyalgia, chronic pain syndrome, major depression, psychosis, IBS, dyspepsia and insomnia. (*Id.* at 483-84). On October 7, 2010 Dr. Artihlan completed a similar

form, citing the same illnesses, indicating that Plaintiff was unable to work for a one year period beginning on October 7, 2010. (*Id.* at 479-80).

On June 29, 2011, Plaintiff underwent a pelvic ultrasound which showed bilateral cysts and a suspected uterine fibroid. Subsequently, on July 30, 2011, Dr. Stefano Stella performed a diagnostic hysteroscopy, dilation and curettage, and endometrial ablation. (*Id.* at 543).

On October 19, 2011, Plaintiff was seen by a dermatologist, Dr. Karen Gordon. Dr. Gordon's notes indicate that Plaintiff had psoriasis on the arms and legs and that Plaintiff did not exhibit any signs of depression, anxiety, or agitation. (*Id.* at 552-53). Dr. Gordon prescribed Plaintiff Ultravate PAC ointment, Methrotrexate, and Bethamethasone Diproprionate. (*Id.* at 554). Plaintiff returned to Dr. Gordon's office to receive UVB phototherapy a total of ten times between September and October 2011. (*Id.* at 560, 564, 566, 568, 570, 572, 574, 576, 578, 581).

2. Mental Impairments

In November of 2010, a report of examination completed by Dr. Melvin Rand, Ph.D., indicated that Plaintiff began psychotherapy for depression on July 8, 2010. (*Id.* at 481-82). Plaintiff indicated that when Dr. Rand retired, Plaintiff began see Dr. Dora Ostrowski for medication management. (*Id.* at 583). Plaintiff's attorney subsequently asked Dr. Ostrowski to submit a statement to be used at the hearing before the ALJ. (*Id.* at 584). On June 15, 2011 Dr. Ostrowski reported that Plaintiff stopped working to care for her ill mother, who eventually passed away, and that is what sparked Plaintiff's depression. (*Id.*). Dr. Ostrowski noted that Plaintiff had been placed on an antidepressants by a neurologist around the same time. (*Id.*). In her report Dr. Ostrowski found that Plaintiff suffered from major depression and anxiety. (*Id.*). The doctor noted that Plaintiff's concentration was poor and that her mood was sad. (*Id.*) Despite Plaintiff's diagnosis, Dr. Ostrowski noted that Plaintiff had no gross intellectual impairments, did not suffer

from delusional thinking of hallucinations, and maintained fair judgment and insight. (*Id.*).   Dr. Ostrowski prescribed Ambien and Celexa, and urged Plaintiff to continue therapy, and take a year off of work. (*Id.*)

After receiving Dr. Ostrowski's 2011 report following the January 6th hearing, the ALJ requested that Plaintiff undergo a psychological evaluation, which was performed by Dr. Solomon Miskin on June 4, 2012. (*Id.* at 28, 588).   During the initial portion of the examination by Dr. Miskin, Plaintiff reported that she was not experiencing any psychotic symptoms and indicated that she had never been hospitalized for psychiatric reasons. (*Id.*).   Plaintiff also reported that her medication was helpful and effective. (*Id.*).   In his report, Dr. Miskin notes that while Plaintiff had good comprehension, her mood was slightly anxious and mildly apprehensive. (*Id.*).   Additionally, Dr. Miskin noted that Plaintiff was able to think abstractly, multiply, add/subtract, spell words backwards, and successfully complete memory tests. (*Id.* at 580-90).   Dr. Miskin also reported that Plaintiff's intelligence was average, and diagnosed her with mild to moderate major depressive disorder without psychotic features. (*Id.*).   Dr. Miskin assigned Plaintiff a Global Assesment of Functioning (GAF) score of 55-60. (*Id.*)

Following his examination of the Plaintiff on June 4, Dr. Miskin completed a Medical Source Statement of Ability to do Work-Related activities (Mental), where he indicated that Plaintiff had no limitation on her ability to remember and carry out both simple and complex instructions. (*Id.* at 592).   Additionally, Plaintiff indicated to Dr. Miskin that she had no limitation on the ability to interact appropriately with the public, or coworkers and supervisors. (*Id.* at 593).

A.    <u>Procedural History</u>

On October 7, 2008, Plaintiff applied for DIB and SSI, alleging that she was disabled and unable to work since October 5, 2007. (R. at 270-75)[1].  Plaintiff's applications were denied initially, and then again upon reconsideration. (*Id.* at 186-97).  A hearing before ALJ James was held on December 2, 2010, in which Plaintiff was present. (*Id.* at 58-82).  At the request of Plaintiff's counsel, the record was left open for 30 days following the hearing to produce additional evidence. (*Id.* at 61).  Plaintiff failed to produce any new evidence, and on April 28, 2011, ALJ Andres issued a decision, finding that Plaintiff was not disabled. (*Id.* at 172-78).

Plaintiff sought Appeals Council review, and on September 19, 2011, the matter was remanded so that the ALJ could reconsider Plaintiff's mental impairments, RFC, and to obtain supplemental evidence from a vocational expert (VE). (*Id.* at 182).

On January 6, 2012, ALJ Richard West held a supplemental hearing, where Plaintiff and a VE both testified. (*Id.* at 83-164).  The record was kept open for several days following the hearing so that Plaintiff could submit additional documents regarding her mental impairments. (*Id.* at 88).  As such, Plaintiff submitted a statement by Dora J. Ostrowski, M.D., detailing Plaintiff's treatment for depression. Subsequently, ALJ West requested a consultative psychiatric evaluation, which was performed by Dr. Solomon Miskin, on June 4, 2012. (*Id.* at 588).  ALJ West proffered Dr. Miskin's report to Plaintiff's counsel, who then requested a supplemental hearing on July 9, 2012. (*Id.* at 361).  On September 5, 2012, ALJ West issued a decision, finding that Plaintiff was not under a disability within the meaning of the Act from the alleged onset date of October 5, 2007, through the date of the decision. (*Id.* at 20-35).  On November 8, 2012, Plaintiff requested Appeals Council review, urging the Appeals Council to vacate the decision of the ALJ and remand the case

---

[1] "R." refers to the pages of the Administrative Record.

for a second supplemental hearing to allow for hypothetical questions to be posed to the VE regarding the consultative examination performed by Dr. Miskin. (*Id.* at 362). On July 3, 2014, the Appeals Council denied Plaintiff's request for review. (*Id.* at 1-5). As a result, Plaintiff appealed to this Court on September 3, 2014. (*See* ECF No. 1). This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

## II.    LEGAL STANDARD

### A.    The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the Administration is authorized to pay disability insurance benefits to "disabled" persons. 42 U.S.C. §§ 423(a), 1382(a). A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(f), 416.920(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. 20 C.F.R. §§ 404.1520(a)(4)(f), 416.920(a)(4)(i). If not, the ALJ proceeds to step

two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Absent such impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Conversely, if the claimant has such impairment, the ALJ proceeds to step three. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If so, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's [RFC]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

The claimant bears the burden of proof for steps one through four. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007) (*citing Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the . . . Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]." *Id.* (*citing Ramirez*, 372 F.3d at 551).

9

B.    The Standard of Review: "Substantial Evidence"[2]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

## III.    DISCUSSION

At step one, the ALJ found that the Plaintiff has not engaged in any substantial gainful activity since October 5, 2007, the alleged onset date. (R. at 25). At step two, the ALJ found that Plaintiff had severe impairments including staph infection, hernia, hepatitis C, fibromyalgia, psoriasis, depression, and anxiety. (*Id.*). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of

---

[2] Because the regulations governing supplemental security income—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).  At step four, the ALJ found that Plaintiff has the RFC to perform sedentary work, with specific limitations, and that she is unable to perform her past relevant work. (*Id.* at 26).  Additionally, at step four the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment." (*Id.*).  At step 5 of the evaluation, the ALJ found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (*Id.* at 27).  Thus, the ALJ concluded that Plaintiff was not disabled. (*Id.* at 30).

Plaintiff proffers five arguments for the Court's consideration. First, Plaintiff contends that her due process rights were violated when the ALJ refused her request for a supplemental hearing following admittance of new evidence post-hearing. (Pl's. Br. 12).   Second, Plaintiff argues that the ALJ failed to give the opinion of the Plaintiff's treating physician sufficient weight regarding her diagnosis of "poor concentration." (*Id.* At 13).  Next, Plaintiff alleges that the ALJ failed to identify her peripheral neuropathy of the lower extremities at step two, and thus failed to fully consider the impairment at step three alone or in combination with Plaintiffs other impairments, or when formulating Plaintiff's RFC. (*Id.* at 14).  Additionally, Plaintiff argues that the ALJ failed to consider Plaintiff's rheumatoid arthritis, skin impairments, or flap and mesh insertions as impairments in any of the steps of the sequential evaluation process. (*Id.* at 16).  Lastly, Plaintiff contends that the ALJ failed to take the frequency of Plaintiff's bathroom visits, along with her peripheral neuropathy into account when formulating Plaintiffs RFC. (*Id.* at 17).

The Court will first address Plaintiff's alleged due process violation argument. However, because the Court finds merit in Plaintiff's contention that the ALJ failed to consider her peripheral

neuropathy at stages two, three, four and five of the analysis, the Court need not address Plaintiff's other arguments.

A.   <u>Whether Plaintiff's Due Process Rights Were Violated When the ALJ Failed to Grant a Request For a Supplemental Hearing</u>

Plaintiff argues that her due process rights were violated when the ALJ ignored her request for a supplemental hearing following admittance of new medical evidence post-hearing. (*Id.* at 12). Plaintiff concedes that the ALJ proffered the medical report obtained post-hearing as required by the HALLEX, however, Plaintiff asserts that the ALJ did not grant Plaintiff's request for a supplemental hearing, also required by the HALLEX. (*Id.*). Defendant claims that the ALJ is not required to grant Plaintiff a supplemental hearing unless "it is determined by the ALJ that such questioning is needed to inquire fully into the issues." (Def's. Br. 15); HALLEX 1-2-7-30. Defendant argues that the ALJ fully developed the record and determined that no further questioning, nor a supplemental hearing were necessary, and thus no due process violation occurred. (*Id.*).

According to its statement of purpose, the SSA's Hearings, Appeals and Litigation Law Manual ("HALLEX") is intended to convey "guiding principles, procedural guidance and information to the Office of Hearings and Appeals ("OHA") staff. . . . It also defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the Hearing, Appeals Council, and Civil Action levels." HALLEX § I-1-0-1, Purpose, http://www.socialsecurity.gov/OP_Home/hallex/I-01/I-1-0-1.html.   Plaintiff cites the portion of the HALLEX which address post-hearing evidence and supplemental hearings, § I-2-7-30(H), which reads in pertinent part; ". . . [i]f the claimant requests a supplemental hearing, the ALJ must grant the request, unless the ALJ receives additional documentary evidence that supports a fully favorable decision . . .". HALLEX § I-2-7-30(H), Proffer Procedures: Action on Receipt of

12

Comments After Proffer, found at http://www.ssa.gov/OP_Home/hallex/I-02/I-2-7-30.html (Last visited April 1, 2015).  Defendant, however, relies on § I-2-7-30(B) of the HALLEX, which states that a proffer letter must

> . . . Give the claimant a time limit to object to, comment on or refute the evidence, submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted, submit written questions to be sent to the author(s) of the proffered evidence or exercise his or her rights with respect to requesting a supplemental hearing, and the opportunity to cross-examine the author(s) of any post[-]hearing report(s) if it is determined by the ALJ that such questioning is needed to inquire fully into the issues.

HALLEX   §   I-2-7-30(H),   Proffer   Procedures:   The   Proffer   Letter,   found   at http://www.ssa.gov/OP_Home/hallex/I-02/I-2-7-30.html (Last visited April 1, 2015).

    Though both Parties in the instant matter cite to provisions of the HALLEX in favor of their respective arguments, "[t]he United States Court of Appeals for the Third Circuit has held that manuals promulgating official Social Security policy and operating instructions, such as HALLEX, "do not have the force of law." *See Muhammad v. Astrue*, 2009 U.S. Dist. LEXIS 116519*, (*citing *Edelman v. Commissioner of Social Security*, 83 F.3d 68, 71 n.2 (3d *Cir. 1996))* *(*citing *Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S. Ct. 1468, 67 L. Ed. 2d 685 (1981*))*. Furthermore, in *Bordes v. Comm'r of Soc. Sec.*, the Third Circuit Court of Appeals held that a claimant's argument that the Appeals Council's actions did not comply with HALLEX and were "fundamentally unfair were without merit". *Bordes v. Comm'r of Soc. Sec., 235 Fed. Appx. 853, 858 (3d. Cir. 2007)*.  However, the Court in *Bordes*, noting that the HALLEX does not create judicially enforceable rights, acknowledged that the United States Court of Appeals for the Fifth Circuit has taken a different approach regarding the enforceability of HALLEX policies and procedures on judicial review. (*Id.* at 859).  That is, the Fifth Circuit has held that if prejudice to

13

the claimant [plaintiff] results from a violation of HALLEX procedures, the determination "can not stand," and thus in some instances the Court could remand as a result of the ALJ's failure to adhere to HALLEX's guidelines. *Id.* (quoting *Newton* v. *Apfel*, 209 F.3d 448, 459-60 (5th Cir. 2000)). While it did not adopt the Fifth Circuit's analysis, the Court of Appeals in *Bordes* nonetheless held that, even under the Fifth Circuit's approach, the claimant had not shown that it was prejudiced by the Appeals Council's failure to comply with its own policies and was therefore not entitled to reversal or remand. *Muhammad v. Astrue*, 2009 U.S. Dist. LEXIS 116519 (citing *Newton v. Apfel*, 209 F.3d 448, 459-60 (5th Cir. 2000)). Plaintiff argues that she should have been afforded the opportunity for a supplemental hearing and to question the VE based on new evidence brought into record, and a new RFC.[3] Here, because the Plaintiff has failed to articulate how she was prejudiced by the ALJ's decision to deny Plaintiff's request for a supplemental hearing, her argument fails.

B.   <u>Whether the ALJ Failed to Consider Plaintiff's Peripheral Neuropathy at Any Stage of the Sequential Evaluation Process</u>

Plaintiff argues that the ALJ failed to consider her bilateral peripheral neuropathy of the lower extremities at any stage of the sequential evaluation process, despite the fact that the ALJ mentioned the ailment in his decision. (Pl's. Br. 14). Specifically, Plaintiff asserts that due to evidence submitted post-hearing, the ALJ should have categorized Plaintiff's peripheral neuropathy as a severe impairment at step two of the analysis. (*Id.*). Further, Plaintiff argues that

---

[3] To the extent Plaintiff argues that she should be afforded the opportunity to be heard at a supplemental hearing in light of additional medical evidence brought into record post-hearing regarding her peripheral neuropathy, the Court rejects this argument. Plaintiff's neuropathy *was in fact discussed* at the January 6 hearing, and Plaintiff had the opportunity to discuss the ailment with both the ALJ, and the VE upon questioning. In any event, as this Court remands this case for the reasons articulated herein, it need not make a determination on this issue.

because the ALJ failed to find peripheral neuropathy a severe impairment at step two, the ALJ's determinations at step three, four, and five are consequently flawed. (*Id.* at 16).

At the outset, the Court notes some discrepancies in Plaintiff's argument. Plaintiff asserts in her brief that the ALJ did not know of Plaintiff's peripheral neuropathy diagnosis until after the January 6, 2012 hearing. (*Id.* at 15). This assertion is incorrect. (R. at 89.). Plaintiff's counsel discussed the peripheral neuropathy diagnosis at the outset of the January 6, 2012 hearing. (*Id.*). Later in the hearing, the ALJ and Plaintiff's spoke again about Plaintiff's peripheral neuropathy, and she offered testimony regarding the pain she was feeling from the ailment. (*Id.* at 109-110). This lack of accuracy in portrayal of the record does not affect the analysis of Plaintiff's argument, but this Court finds the errors are important to note.

In determining whether an impairment is severe at Step Two, the Third Circuit has laid out the following analysis:

> "The step-two inquiry is a de minimis screening device to dispose of groundless claims. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have no more than a minimal effect on an individual's ability to work. Only those claimants with slight abnormalities that do not significantly limit any "basic work activity" can be denied benefits at step two. If the evidence presented by the claimant presents more than a "slight abnormality," the step-two requirement of "severe" is met, and the sequential evaluation process should continue. Reasonable doubts on severity are to be resolved in favor of the claimant."

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (citations omitted). "'The burden placed on an applicant at step two is not an exacting one...an applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have

no more than a minimal effect on an individual's ability to work.'" *Feliciano v. Astrue*, 2012 U.S. Dist. LEXIS 100913, (citing *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).

In the instant case, Plaintiff provided documentation regarding her bilateral peripheral neuropathy of the lower extremities to the ALJ at the hearing (that were later entered into evidence), as well as direct testimony from the Plaintiff regarding the pain and limitations that resulted from her diagnosis. (R. at 109, 533). Plaintiff testified that her entire "lower area" is constantly in pain due to her peripheral neuropathy. (*Id.* at 109). Although there is a small amount of evidence referencing the peripheral neuropathy in the record, it is clear to this Court that Plaintiff met her burden of proof in showing that her peripheral neuropathy was beyond a slight abnormality, and that a more than minimal effect on Plaintiff's ability to work may have been present.

In *Jones v. Barnhart*, 364 F.3d 501 (3d Cir. 2004), the Third Circuit explained that, while an ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis," the decision "read as a whole" must be capable of providing meaningful judicial review. (*Id.* at 505). Here, without the ALJ having fully addressed the medical and testimonial record referencing Plaintiff's peripheral neuropathy, the Court cannot conduct meaningful judicial review of the ALJ's Step Two findings, nor entirety of the decision. *See e.g. Sincavage v. Barnhart*, 171 Fed.Appx. 924, 925 (3d Cir. 2006) (remanding where ALJ failed to discuss, in Step Two analysis, medical reports recognizing that claimant suffered from panic attacks and failed to assess the impact of those attacks on the claimant's ability to work). Indeed, the ALJ did mention the "new evidence" of peripheral neuropathy in his decision when formulating Plaintiff's RFC, however the ALJ failed to address the impairment anywhere else in the decision. This does not coincide with the dicta of *Jones*. Should the ALJ have determined at Step Two that Plaintiff

16

suffered from the severe impairment of peripheral neuropathy, the entire sequential evaluation would have changed. Therefore, the Court will remand this case for a discussion of the evidence and an explanation of the ALJ's reasoning supporting a determination regarding Plaintiff's peripheral neuropathy.

## IV.   CONCLUSION

The Court has reviewed the entire record, and for the reasons discussed above, finds that the ALJ's lack of analysis regarding Plaintiff's peripheral neuropathy is not supported by substantial evidence. Accordingly, the Court remands this matter to the ALJ. On remand, the Court directs the ALJ to consider Plaintiff's peripheral neuropathy at step two.  If the ALJ determines that Plaintiff has a severe impairment of peripheral neuropathy at step two, the ALJ is further directed to move forward with the sequential evaluation process, while considering Plaintiff's peripheral neuropathy at each subsequent step.  An appropriate Order accompanies this opinion.

Date: April 27 2015

José L. Linares, U.S.D.J.